# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
| V. | CASE NUMBER:   20-5197MJ |
| ROBERT EARL WRIGHT | |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

On or about the dates described in Attachment A in the County of Maricopa in the District of Arizona, the defendant violated 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), 18 U.S.C. §§ 922(g)(1) 922(o)(1), and 924(a)(2), offenses described as follows:

**See Attachment A – Description of Counts**

I further state that I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives and this complaint is based on the following facts:

**See Attachment B – Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

AUTHORIZED BY: Justin Oshana, AUSA

Special Agent Dustin Lyon, ATF

Name of Complainant

Signature of Complainant

Sworn before me telephonically

August 4, 2020    at 8:10 p.m.

Date

at    Phoenix, Arizona

City and State

Honorable Deborah M. Fine
United States Magistrate Judge

Name & Title of Judicial Officer

Signature of Judicial Officer

## Attachment A – Description of Counts

### COUNT 1

On or about March 10, 2020, in the District of Arizona, the Defendant, ROBERT WRIGHT, did knowingly and intentionally possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT 2

On or about March 18, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, did knowingly and intentionally possess with the intent to distribute a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT 3

On or about July 22, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, did knowingly and intentionally possess with the intent to distribute a mixture of substance containing a detectable amount of heroin, a Schedule I controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT 4

On or about July 29, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, did knowingly and intentionally possess with the intent to distribute a mixture of substance containing a detectable amount of heroin, a Schedule I controlled substance,

In violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT 5

On or about March 12, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm, that is, a Ruger Model SR9C; nine millimeter pistol, and ammunition, that is, ten (10) rounds of nine millimeter

ammunition, said firearm having been previously been shipped and transported in interstate commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## COUNT 6

On or about March 25, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, did knowingly possess and transfer a machine gun, that is, an AR-15 automatic rifle.

In violation of Title 18, United States Code, Sections 922(o)(1)and 924(a)(2).

## COUNT 7

On or about March 25, 2020, in the District of Arizona, the defendant, ROBERT WRIGHT, knowing that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess a firearm, that is, an AR-15 automatic rifle, said firearm having been previously been shipped and transported in interstate commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## ATTACHMENT B

## STATEMENT OF PROBABLE CAUSE

I, Dustin Lyon, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and have been so employed since May of 2015. I am presently a member of the ATF Phoenix Field Division's Group II Violent Crimes Task Force. My duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code (U.S.C.). I have previously participated in investigations which resulted in the arrests, searches, and seizures of individuals and property. In the course of my career with ATF, I have participated in the use of cooperating informants, undercover agents, pen register/trap and trace devices, video surveillance, wiretaps, GPS tracking devices, search warrants, and audio surveillance, among other law enforcement techniques. Additionally, I have participated in numerous controlled buys of narcotics and firearms from targets of law enforcement investigations. Prior to my employment with ATF, I was employed with the Avondale Police Department (APD) as a Police Officer from April 2005 to May 2015. During my employment with APD, I served in several positions, including patrol officer, Field Training Officer, SWAT Operator, and Patrol Sergeant, and participated in a wide

1

range of investigations regarding firearm violations, narcotics possession and distribution, violent crimes, and gang-related crimes. Based on my training and experience, I am familiar with methods used by the criminal element to further a variety of criminal activities.

2. I have conducted numerous violent crime and narcotics-related investigations as a police officer and have also participated in similar investigations as a Special Agent with ATF. I have interviewed persons charged with and convicted of violent crimes, firearm violations, narcotics-related crimes, and other felony offenses. .

3. Through my training and experience, I have become familiar with: 1) the manner in which controlled substances are imported, manufactured, distributed and sold; 2) the activities of persons engaged in the importation, manufacture, distribution and sale of controlled substances; the activities of persons engaged in the illegal possession and manufacturing, and distribution of firearms and ammunition; 4) the use of methods to avoid detection and apprehension by law enforcement officers. I have also become familiar with the manner in which proceeds from the sale of narcotics and firearms are hidden and transported, as well as the efforts persons engaged in the transportation and laundering of said illicit proceeds will make to avoid detection, apprehension, and seizure by law enforcement officers. I am also familiar with methods used by firearm and narcotic traffickers to hide, convert or otherwise conceal proceeds of such activities.

4. I have also become familiar with violent crimes as it relates to firearm and narcotic trafficking. I have personally interviewed numerous individuals who have described how they conspire and execute the trafficking of firearms and narcotics.

2

5.     I learned the facts contained in this affidavit from my own investigation and from the investigation of other law enforcement officers who are working the case with me.  The facts of which I know to be true are detailed below.

## **PROBABLE CAUSE**

6.     In January 2020, ATF, Department of Public Safety (DPS), and Phoenix Police Department (PPD) began working a joint criminal investigation of a criminal street gangs and violent crimes in the south Phoenix area.  During the course of this investigation, in March 2020, ATF investigators identified Robert Earl WRIGHT (hereinafter referred to as WRIGHT) as a potential target of this investigation. WRIGHT was identified as a potential target upon ATF Confidential Source (CS) (hereinafter identified as CS-1) meeting WRIGHT at a public location.  During the initial meeting between CS-1 and WRIGHT they exchanged phone numbers.  Following the initial meeting between CS-1 and WRIGHT, CS-1 and WRIGHT engaged in numerous recorded phone conversations regarding potential transactions involving narcotics and firearms.  WRIGHT indicated he was able to obtain various types of narcotics and firearms and was willing to sell to CS-1. Investigators were able to positivity identify WRIGHT upon conducting law enforcement database queries and obtained an Arizona Motor Vehicle Division photograph. Investigators showed CS-1 a photograph of WRIGHT, CS-1 positively identified WRIGHT as the person CS-1 knew by the moniker "Black." CS-1 confirmed WRIGHT was the person CS-1 had previously met and had engaged in conversations in person and by telephone in reference to firearms and narcotic purchases.  WRIGHT was identified as a possible target upon confirming WRIGHT was previously convicted of a felony offense for an armed robbery in 2007 in the County of Maricopa, District of Arizona.  WRIGHT was also identified as a possible gang member due to statements made by WRIGHT to CS-1 and also based on WRIGHT's criminal history.  Based on further investigation,

3

investigators learned WRIGHT's 2007 armed robbery conviction involved several co-defendants who were documented members of criminal street gangs in Arizona at the time.

6. Between March 7 and March 9, 2020, CS-1 and WRIGHT engaged in several recorded telephone conversations, during which WRIGHT discussed narcotic and firearms transactions with CS-1. On March 9, 2020, WRIGHT advised CS-1 he would sell CS-1 a half-ounce of cocaine for $500.

7. On March 10, 2020, investigators coordinated a controlled purchase of a half-ounce of cocaine from WRIGHT. During the controlled purchase, CS-1 was equipped with an audio recorder/transmitter. Investigators were able to maintain both audio and visual surveillance of CS-1 during the controlled purchase. During the controlled purchase, CS-1 contacted WRIGHT numerous times by cellular telephone on a recorded telephone to coordinate the transaction. CS-1 met with WRIGHT at a public location and purchased the half-ounce of cocaine from WRIGHT using $500 in government funds. During the transaction, investigators observed WRIGHT enter CS-1's vehicle and conduct the transaction. Investigators were able to positively identify WRIGHT during the transaction. During the controlled purchase, CS-1 and WRIGHT discussed future narcotic transactions. Upon the completion of the transaction, investigators seized the cocaine purchased from WRIGHT from CS-1. The narcotics were field tested and tested positive for presence of cocaine. Investigators weighed the narcotics and determined the weight to be sixteen grams.

8. On March 11, 2020, CS-1 contacted WRIGHT and conducted an audio recorded telephone call, during which CS-1 and WRIGHT discussed the sale of a firearm to CS-1. WRIGHT described the firearm as a 9 millimeter pistol and stated he would sell the firearm to CS-1 for $300. WRIGHT further advised CS-1 he already purchased the firearm for $250 and had the firearm in his possession.

4

9.    On March 12, 2020, investigators coordinated a controlled purchase of the firearm from WRIGHT as discussed with CS-1 on March 11, 2020. During the controlled purchase CS-1 was equipped with an audio recorder/transmitter. Investigators were able to maintain constant audio and visual surveillance of CS-1 during the controlled purchase. CS-1 met with WRIGHT in the area of 15th Street and Highland Avenue in Phoenix, Arizona near an apartment complex WRIGHT stated he was staying at. Upon CS-1's arrival, investigators observed WRIGHT exit the apartment complex and enter CS-1's vehicle and conduct the sale of the firearm. Investigators were able to monitor the entire conversation and confirmed WRIGHT sold the firearm to CS-1. CS-1 purchased the firearm for $300.00 in government funds. Upon completion of the controlled purchase, investigators met with CS-1 at a pre-determined location and seized the firearm. Investigators inspected the firearm and determined the firearm to be a Ruger Model SR9C with serial number 33252642. Investigators also determined the firearm had ten rounds of nine-millimeter ammunition loaded in the magazine of the firearm. CS-1 was debriefed regarding the transaction. CS-1 confirmed WRIGHT was the person who sold the firearm to CS-1 and CS-1 paid $300 for the firearm.

10.    Between March 13, 2020 and March 17, 2020, CS-1 had numerous recorded conversations with WRIGHT via telephone calls. During these conversations, WRIGHT advised CS-1 he had received a large amount of heroin from a source and was trying to sell it quickly. On March 17, 2020, CS-1 contacted WRIGHT by telephone and further discussed the purchase of an ounce of heroin during a recorded call. CS-1 advised WRIGHT he/she had an associate/source that was interested in buying the heroin. WRIGHT advised CS-1 he would sell a half an ounce of heroin for $450 and an ounce for $900. WRIGHT advised CS-1 the price stated was an "introduction" price and would change upon the next transaction. WRIGHT agreed to sell a half-ounce of heroin to for $450 on March 18, 2020 to CS-1 and associate. During these recorded conversations, WRIGHT also discussed the sale of two firearms with CS-1. WRIGHT advised he had a

5

Glock 40 caliber pistol and a 38-caliber revolver he was selling. WRIGHT advised he would sell the Glock pistol for $500. CS-1 advised WRIGHT his/her associate wanted to buy the Glock pistol. WRIGHT agreed to sell the Glock pistol for $500.

11.     On March 18, 2020, investigators coordinated a controlled purchase of a half-ounce of heroin and a firearm from WRIGHT. During the controlled purchase, CS-1 introduced ATF SA UC-5096 (herein after referred to as UC-1) as the buyer/associate. During the controlled purchase, CS-1 and UC-1 were both equipped with an audio recorder/transmitter. Investigators maintained constant audio and visual surveillance of CS-1 and UC-1 during the operation. CS-1 contacted WRIGHT via telephone to coordinate the purchase of the heroin. During the recorded phone conversations, WRIGHT agreed to have CS-1 pick him up at his (WRIGHT's) residence located at 2419 West Alta Vista Road, Phoenix, Arizona and they would meet UC-1 at a predetermined location. WRIGHT also advised CS-1 he had already sold the Glock pistol but he would attempt to get the 38-caliber revolver for CS-1 to buy.

12.     On March 18, 2020, investigators conducted surveillance at WRIGHT's residence during the controlled purchase. Investigators observed CS-1 arrive at WRIGHT's residence. Upon arrival, CS-1 contacted WRIGHT by telephone advising of his/her arrival. Investigators then observed WRIGHT exit his residence and enter CS-1's vehicle. CS-1 drove to a gas station located at 19th Avenue and Southern Avenue, Phoenix, Arizona. While in the parking lot of the gas station, investigators heard WRIGHT tell CS-1 he did not like the location because there was too many "cops." WRIGHT instructed CS-1 to drive to a liquor store across the street from where they were parked. Upon CS-1 and WRIGHT's arrival at the liquor store, CS-1 contacted UC-1 and advised of their location. UC-1 while operating an Under Cover Vehicle equipped with both audio and video surveillance drove to the liquor store to meet CS-1 and WRIGHT. Upon arrival at the location, WRIGHT and CS-1 exited CS-1's vehicle and entered UC-1's vehicle. While

inside the vehicle, UC-1 conducted the purchase of a half-ounce of heroin from WRIGHT. During the controlled purchase, UC-1 and WRIGHT discussed future narcotic and firearm transactions. WRIGHT advised UC-1 of his ability to obtain various types of narcotics to include heroin. WRIGHT and UC-1 also discussed the purchase of firearms. WRIGHT advised he has sources to obtain additional firearms and asked UC-1 if UC-1 was interested in fully automatic firearms. UC-1 completed the purchase of the half-ounce of heroin and paid WRIGHT $450 in government funds. Additionally, WRIGHT provided UC-1 with the telephone number for future communication.

13. Upon the completion of the transaction, UC-1 departed the location and met with investigators at a predetermined location. CS-1 and WRIGHT departed the location in CS-1's vehicle drove back to WRIGHT's residence. Upon arrival, investigators observed WRIGHT exit CS-1's vehicle and enter his residence. While driving to WRIGHT's residence, CS-1 and WRIGHT continued to discuss future narcotic and firearms transactions.

14. CS-1 then departed WRIGHT's residence and met with investigators at a predetermined location. Upon arrival, investigators debriefed CS-1. CS-1 confirmed WRIGHT sold the heroin to UC-1 and confirmed UC-1 and WRIGHT engaged in conversation reference future narcotics and firearm transactions after completing the transaction with UC-1. CS-1 also advised WRIGHT discussed selling fully automatic firearms with UC-1 during the transaction.

15. Investigators debriefed UC-1. UC-1 said that WRIGHT sold UC-1 a half-ounce of black tar heroin for $450. UC-1 said that during the transaction, WRIGHT made numerous statements about his ability to obtain narcotics and firearms and briefly discussed narcotic prices and asked UC-1 if he/she was interested in purchasing fully automatic firearms. Investigators conducted a field test of the suspected heroin and the test result were in fact

positive for the presence of heroin. Investigators weighed the heroin and determined the heroin weighed thirteen grams.

16.    On March 20, 2020, WRIGHT contacted UC-1 by telephone and during the recorded conversation with UC-1, WRIGHT said he had two fully automatic AR-15 style firearms for sale. WRIGHT advised he would sell them for $2,000 each. On the same date, WRIGHT sent UC-1 a photograph from his (WRIGHT) cellular telephone to UC-1 of two AR-15 variant type firearms. Upon receiving the photograph from WRIGHT, investigators determined the firearms appeared to be the same make and model firearm, as they appeared to be identical. Additionally, investigators believed the firearms appeared to be short barreled rifles based on the length of the barrel and the absence of a forearm stabilizer brace.

17.    On March 21, 2020, UC-1 contacted WRIGHT by telephone. During the recorded conversation, UC-1 and WRIGHT continued to discuss narcotic and firearm transactions to include the fully automatic firearms WRIGHT had previously discussed. On March 24, 2020, UC-1 again contacted WRIGHT by telephone and during the recorded phone call UC-1 and advised he/she wanted to buy the firearms from WRIGHT, referring to the two fully automatic rifles. WRIGHT agreed to sell the firearms to UC-1. UC-1 and WRIGHT discussed the transaction and price for each of the firearms. WRIGHT told UC-1 the firearms were $2,000 each. UC-1 and WRIGHT also discussed the purchase of one ounce of heroin. WRIGHT advised he did not currently have any heroin for sale but would contact his source and attempt to get the heroin for UC-1. WRIGHT agreed to meet UC-1 on March 25, 2020 to complete the sale of the firearms and heroin.

18.    On March 25, 2020, investigators coordinated a controlled purchase of the firearm and narcotics from WRIGHT. During the controlled purchase UC-1 and CS-1 were both equipped with and audio recorder/transmitter. Investigators were able to maintain audio

8

and visual surveillance of UC-1 and CS-1 during the controlled purchase. On the listed date, UC-1 contacted WRIGHT by telephone and coordinated the transaction. WRIGHT advised he was at his residence at 2419 West Alta Vista Road, Phoenix, Arizona. UC-1 advised WRIGHT that CS-1 would pick WRIGHT up at his residence and then meet with UC-1 to complete the transaction. UC-1 and WRIGHT agreed to meet at the same liquor store they conducted the previous transaction on March 18, 2020. Prior to the controlled purchase, WRIGHT advised CS-1 he had already sold one of the two rifles.

19.     CS-1 contacted WRIGHT by telephone and advised he/she was on their way to WRIGHT's residence. WRIGHT agreed to meet CS-1 at his residence. Investigators conducting surveillance at WRIGHT's residence observed CS-1 arrive at WRIGHT's residence. Upon arrival, investigators observed WRIGHT exit his residence and enter CS-1's vehicle. Upon exiting the residence, WRIGHT was carrying a large dark colored duffel bag. CS-1 and WRIGHT then drove to a liquor store at 19th Avenue and Southern Avenue Phoenix, Arizona where they previously agreed to meet UC-1 to complete the transaction. Upon arrival, CS-1 contacted UC-1 and advised of their arrival and location. UC-1 instructed CS-1 to meet UC-1 at a self-service car wash just east of the liquor store. UC-1 then drove the UCV equipped with audio and video surveillance to the liquor store to meet CS-1 and WRIGHT. Upon arrival, UC-1 and CS-1 both drove their vehicles to the car wash and parked in a car wash bay.

20.     Investigators were able to maintain audio and visual surveillance during the entire transaction. Investigators observed CS-1 and WRIGHT exit CS-1's vehicle and approach UC-1's vehicle. Upon making contact, UC-1 and WRIGHT discussed the transaction of the firearm. UC-1 conducted the purchase of the AR-15 variant firearm from WRIGHT. During the transaction, UC-1 and WRIGHT discussed the firearm and WRIGHT told UC-1 he had already sold one of the two rifles earlier that day. WRIGHT made several statements confirming his knowledge of the firearm and that it was a fully automatic rifle

9

and described how the firearm operates and fires. WRIGHT made statements to UC-1 that he had a third rifle that was similar to the one he sold UC-1. WRIGHT told UC-1 the third rifle was his personal firearm and he wasn't selling that one. WRIGHT also advised he was unable to obtain the ounce of heroin previously discussed with UC-1. UC-1 and WRIGHT continued to discuss future firearms and narcotic transactions during the meeting. WRIGHT made numerous statements regarding his ability to obtain additional firearms to include firearms similar to the one UC-1 was buying at the time (fully automatic rifles). UC-1 completed the purchase of the firearm and paid WRIGHT $2,000 in government funds. Upon completion the transaction, UC-1 departed the location and met with investigators at a predetermined location.

21. CS-1 and WRIGHT then departed the location and drove back to WRIGHT's residence. Investigators observed CS-1 arrive at the residence and observed WRIGHT enter the residence after exiting CS-1's vehicle. Investigators observed WRIGHT was carrying the same duffel bag as earlier and that it appeared to be empty. CS-1 then departed the residence and met with investigators at a predetermined location. Investigators debriefed CS-1 and confirmed WRIGHT had sold UC-1 the firearm. CS-1 said WRIGHT and UC-1 discussed the firearm, and WRIGHT made several statements about how the firearm functioned and his knowledge that the firearm was fully automatic.

22. Investigators conducted a debrief of UC-1 who confirmed WRIGHT was the person who sold UC-1 the firearm. UC-1 said WRIGHT made several statements about his knowledge of the firearm and that it was fully automatic. UC-1 said WRIGHT also made statements regarding getting additional firearms to include firearms like the one UC-1 had just purchased. UC-1 said WRIGHT also made statements about having multiple sources for the firearms and heroin to include white powder heroin, he was selling.

23.     Investigators seized the firearm purchased by UC-1 from WRIGHT. Upon initial inspection of the firearm, investigators determined the firearm to be an AR-15 variant rifle. Investigators were unable to locate any serial numbers and/or manufacture markings on the firearm. Investigators conducted a field function test of the firearm and determined it to be a fully automatic firearm based on how the firearm functioned. Investigators also observed the firearm to be manufactured as a fully automatic firearm and not converted after manufacturing. Additionally, the firearm appeared to have a barrel with a length shorter than permitted by law. Investigators later measured the firearm and determined the barrel of the firearm was approximately nine inches and the overall length of the firearm was approximately twenty-three and a half inches. Based on the measurements of the barrel, the overall length of the firearm, and the absence of a forearm stabilizer brace, investigators determined the firearm to be a short-barrel rifle AR-15 variant.

24.     On March 25, 2020, following the purchase of the firearm, WRIGHT contacted UC-1 by telephone, during the recorded phone conversation WRIGHT told UC-1 he had obtained an ounce of heroin and wanted to sell to UC-1 for $1,000. The controlled purchase of the one ounce of heroin did not occur.

25.     Between March 25, 2020 and June 16, 2020, UC-1 and WRIGHT maintained contact by telephone through recorded phone calls and recorded text messages. During the communication between UC-1 and WRIGHT, they engaged in general conversations and also discussed future firearms and narcotic transactions.

26.     Between April 7, 2020 and May 8, 2020 investigators conducted both electronic and physical surveillance of WRIGHT's residence located at 2419 West Alta Vista Road Phoenix, AZ. During surveillance operations, investigators observed activity consistent with narcotics and/or firearms trafficking. Investigators observed numerous vehicles and unknown subjects at the house throughout the day and various times. Investigators

11

observed the majority of people who arrived at the residence would enter the residence and only stay for a short time. Additionally, investigators observed the majority of the activity occurred only while WRIGHT was present at the residence. During the times WRIGHT was not present at the residence, the traffic at the house was very minimal. Based on the activity observed and the training and experience of investigators, investigators believed the activity was consistent with narcotic trafficking. On May 8, 2020, investigators learned WRIGHT had moved from the residence after observing him loading a moving truck with personal belongings.

27. On June 16, 2020, UC-1 contacted WRIGHT by telephone to discuss future narcotic and firearm transactions and discussed meeting in person. WRIGHT agreed to meet UC-1 on the listed date at a public location. During the operation UC-1 was equipped with an audio recorder/transmitter. UC-1 was also driving an undercover vehicle that was equipped with audio and video recording equipment. Surveillance personnel were able to maintain visual and audio surveillance of UC-1 during the operation.

28. UC-1 met with WRIGHT at the agreed upon location. Upon WRIGHT arriving at the location, surveillance personnel observed WRIGHT exit his vehicle and entered UC-1's vehicle. UC-1 and WRIGHT then discussed firearm and narcotic transaction and prices. During the meeting, WRIGHT made statements to UC-1 indicating he was able to get additional firearms similar to the fully automatic rifle UC-1 had previously purchased. While in the undercover vehicle, WRIGHT made a telephone call to an unknown person. During the telephone conversation, WRIGHT engaged in conversation indicating he was talking to a source of firearms. Upon completion of the meeting, UC-1 departed the location and met with investigators at a predetermined location. Investigators debriefed UC-1, UC-1 confirmed the person he/she met with was WRIGHT. UC-1 confirmed WRIGHT engaged in conversation about narcotic and firearm transactions and discussed prices. UC-1 said that during the meeting WRIGHT contacted someone by telephone and,

12

based on the conversation, UC-1 believed WRIGHT was talking to his source of the fully automatic rifles. UC-1 said WRIGHT discussed with the person on the telephone about getting additional firearms and prices.

29.     On July 21, 2020, CS-1 contacted WRIGHT in person at a residence in south Phoenix. During the meeting, CS-1 and WRIGHT discussed narcotic transactions. WRIGHT told CS-1 he would sell twelve grams of heroin to CS-1 for $350.00. CS-1 and WRIGHT agreed to meet on July 22, 2020 to complete the transaction.

30.     On July 22, 2020, investigators coordinated a controlled purchase of the heroin from WRIGHT. CS-1 contacted WRIGHT by telephone and during a recorded conversation, WRIGHT indicated he had the heroin and would meet CS-1. CS-1 and WRIGHT agreed to meet at an apartment complex at 3434 E. Baseline Road Phoenix, Arizona. During the transaction, CS-1 was equipped with an audio recorder/transmitter. Surveillance personnel maintained audio and visual surveillance of CS-1 during the controlled purchase.

31.     Prior to CS-1 arriving at the apartment complex, surveillance personnel established surveillance at the apartment complex and observed WRIGHT's vehicle parked in the gated area. Upon CS-1 arrival at the listed address, CS-1 contacted WRIGHT by telephone, WRIGHT provided CS-1 the gate entry code in order to gain access and instructed CS-1 to meet him just north of the gate near WRIGHT's vehicle.

32.     CS-1 entered the apartment complex and parked just north of the entrance gate. Surveillance personnel observed WRIGHT exit apartment #209 and walk to CS-1's vehicle. Investigators were able to maintain audio surveillance during the transaction. CS-1 and WRIGHT then completed the transaction while WRIGHT remained outside the vehicle. Investigators confirmed based on the conversation that CS-1 had purchased the heroin from WRIGHT for $350 in government funds. Upon completion of the transaction

13

CS-1 departed the location. Surveillance personnel maintained audio and visual surveillance of CS-1 until arrival at the staging location. Surveillance personnel observed WRIGHT depart the location in his vehicle and maintained visual surveillance of WRIGHT until CS-1 was out of the area.

33.    Upon arrival at the staging location, investigators contacted CS-1 and seized the heroin purchased from WRIGHT.  Upon seizing the heroin, investigators observed the narcotics were contained in a clear plastic bag and had the appearance of consistency of "black tar" heroin.  Investigators conducted a debrief of CS-1, CS-1 confirmed he/she purchased the heroin from WRIGHT for $350.00 in government funds. CS-1 said he/she did not see what apartment WRIGHT exited from. Investigators later field tested the narcotics and it tested positive for the presence of heroin and determined the weight of the heroin was thirteen grams.

34.    On July 24, 2020, CS-1 contacted WRIGHT at a residence located at 7364 W. Alicia Drive Phoenix, Arizona. WRIGHT identified the residence as his and stated he had just moved in with his girlfriend.  While at the residence, CS-1 and WRIGHT discussed firearm and narcotic transactions.  CS-1 told investigators that while at WRIGHT's residence he (WRIGHT) attempted to give CS-1 more heroin. CS-1 said that WRIGHT removed a bag from his freezer and placed it on the kitchen table. CS-1 told WRIGHT he/she was not able to purchase more heroin at the time. CS-1 said WRIGHT stated he was attempting to get another firearm for CS-1. WRIGHT told CS-1 he had firearms in the house but he wasn't selling them because they were his personal firearms. CS-1 told investigators the heroin WRIGHT tried to sell CS-1 was approximately the same amount (thirteen grams) CS-1 had previously purchased.  CS-1 said that WRIGHT stated he had two and a half ounces of heroin he was selling during the conversation.

14

36.    On July 27, 2020, investigators confirmed WRIGHT's residence was located at 7364 W. Alice Drive Phoenix, Arizona. While conducting surveillance at the residence, investigators observed WRIGHT's vehicle parked at the residence throughout the day. Investigators also observed WRIGHT's girlfriend returning to the residence and confirmed the presence of her vehicle at the residence.

35.    On July 28, 2020, CS-1 contacted WRIGHT by telephone, during the recorded conversation CS-1 and WRIGHT discussed a narcotic and firearm transaction. WRIGHT said he could meet CS-1 on July 29, 2020 at WRIGHT's residence to complete the transaction. During a debrief with CS-1, he/she advised the conversation between CS-1 and WRIGHT was reference the purchase of twelve grams of heroin as previously discussed on July 24, 2020. CS-1 advised WRIGHT agreed to the same price of $350 for the heroin.

36.    On July 29, 2020, investigators coordinated a controlled purchase of heroin from WRIGHT. During the controlled purchase, CS-1 was equipped with an audio recorder/transmitter.  Surveillance personnel were able to maintain visual and audio surveillance of CS-1 throughout the controlled purchase.  CS-1 contacted WRIGHT by telephone to confirm WRIGHT was ready to conduct the transaction, WRIGHT confirmed and advised CS-1 to come to his residence.

37.    On July 29, 2020, during the controlled purchase, CS-1 drove to WRIGHT's residence located at 7364 W. Alicia Drive Phoenix, Arizona.  Upon arrival, CS-1 contacted WRIGHT and told him he/she was outside the residence.  Surveillance observed WRIGHT exit his residence and enter his vehicle parked in the driveway.  WRIGHT was observed walking to CS-1's vehicle and entering the front passenger seat.  CS-1 and WRIGHT then completed the transaction of the heroin. CS-1 purchased the heroin from WRIGHT for $353 in government funds.  During the transaction, CS-1 and WRIGHT engaged in

15

conversation regarding firearm transactions. WRIGHT told CS-1 he was trying to obtain a forty or forty-five caliber handgun and was waiting for his source to contact him. WRIGHT told CS-1 he would contact CS-1 if he was able to get a firearm. Upon completion of the transaction, CS-1 departed the residence and WRIGHT reentered his residence.

38.    Surveillance personnel maintained visual and audio surveillance of CS-1 until arrival at the staging location. Upon arrival, investigators contacted CS-1 and seized the heroin purchased from WRIGHT. Investigators observed a clear plastic bag containing a hard black substance that had the appearance and consistency of "black tar" heroin.

39.    Investigators debriefed CS-1, who confirmed he/she purchased the heroin from WRIGHT who exited his residence and conducted the transaction in CS-1's vehicle. CS-1 confirmed they engaged in conversation about a firearm and WRIGHT told CS-1 he was trying to locate a firearm for CS-1. CS-1 advised he paid $353 for the heroin due to WRIGHT not having change.

40.    Investigators conducted a field test of the narcotics and confirmed the test results were positive for the presence of heroin. Investigators weighed the heroin and determined the heroin weighed thirteen grams.

41.    For these reasons, your affiant submits that there is probable cause to believe Robert Earl WRIGHT committed the following offenses: Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), and Title 18, United States Code, Sections 922(g)(1), 922(o)(1) and 924(a)(2).

This affidavit was sworn telephonically before a United States Magistrate Judge legally authorized to administer an oath for this purpose. I have thoroughly reviewed the affidavit

16

and the attachments to it, and attest that there is sufficient evidence to establish probable cause that Defendant ROBERT EARL WRIGHT has violated Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), Title 18, United States Code, Sections 922(g)(1) and 924(a)(2), and Title 18, United States Code, Sections 922(g)(1), 922(o)(1) and 924(a)(2), as more fully described in Attachment A to this complaint.

*Dustin Lyon*

Dustin Lyon
SPECIAL AGENT
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to telephonically before me this 4th day of August, 2020.  at 8:10 p.m.

HONORABLE DEBORAH M. FINE
UNITED STATES MAGISTRATE JUDGE

17